**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Palantir Technologies Inc.,

*Plaintiff,*

v.

Guardian AI, Inc., Mayank Jain, Pranav Pillai,
and DOES 1-10,
*Defendants.*

---

Civil Action No.: _____

**JURY DEMAND**

<u>**COMPLAINT**</u>

1.      Palantir Technologies Inc. ("Palantir"), by and through its counsel, brings this action to remedy brazen trade secret theft perpetrated by its former employees Mayank Jain ("Jain") and Pranav Pillai ("Pillai"). These individuals were entrusted with Palantir's hard-won trade secrets that few Palantir employees can access. These trade secrets enable Palantir to provide leading healthcare systems with a system that optimizes complex workflows with AI-driven automations. In blatant disregard of their obligations to Palantir, Pillai and Jain founded a startup, Guardian AI, Inc. ("Guardian AI") to unfairly commercialize the very same trade secrets for their own benefit. Pillai and Jain's conduct exemplifies, at least, trade secret misappropriation and also violates a one-year non-compete agreement.

2.      In this action, Palantir asks the Court to (i) put a stop to Pillai, Jain, and Guardian AI's theft of Palantir's proprietary information, (ii) require them to account for their misuse of Palantir's intellectual property, and (iii) enforce Pillai's and Jain's broken promises to refrain from competing with Palantir and to reimburse it for the costs incurred in enforcing its rights. Palantir also seeks compensatory damages, disgorgement of profits, and costs against Guardian AI. Because this case is egregious, Palantir also seeks treble damages and an award of attorneys' fees.

In a further effort to defend its intellectual property, Palantir intends to commence arbitral proceedings against Jain and Pillai individually to, among other things, claw back their compensation under the faithless servant doctrine, obtain treble damages and disgorgement of any ill-gotten profits, and recover Palantir's attorneys' fees and costs. If, for any reason, those claims for relief are not subject to mandatory arbitration, Palantir reserves the right to assert them here.

                              *     *     *

3.    Palantir invents, builds, and deploys software solutions that empower organizations to integrate their data, decisions, and operations at scale. Palantir's advanced data analytics software has assisted the United States law enforcement and defense capabilities since its founding in 2003. It played a crucial role in the U.S. government's counter-terrorism efforts by providing data integration and analysis tools that helped track and dismantle terrorist networks. Additionally, Palantir's software was pivotal in the fight against COVID-19, aiding the U.S. Department of Health and Human Services in managing and analyzing vast amounts of health data to inform public health decisions. The company has also partnered with major commercial entities to optimize their supply chain operations and production processes. Palantir's development and integration of artificial intelligence has further enhanced its transformative solutions.

4.    Palantir's fast-growing Healthcare division designed an AI and data-driven solution to help healthcare providers get paid for the services that they provide. When insurance companies deny a provider's request for payment, the provider has to engage in a cumbrous and time-consuming process to appeal the denial. The administrative burden is substantial, and often the provider must simply write off the work. Palantir's solution was to **automate denials management with AI, which would help reduce write-offs and eliminate hundreds of hours of administrative work**. The Palantir team that worked on this and related projects included Jain

and Pillai. Palantir provided them with the training, customer contacts, confidential and trade secret information, and technology tools needed to develop and deploy these solutions for Palantir.

5.     Additionally, as forward-deployed engineers, one of Jain and Pillai's responsibilities was to create and iterate new ways to optimize and configure Palantir's software to solve problems in the field. This work was for Palantir and owned by Palantir (not to be secretly used by employees to launch competing businesses). Due to the sensitive and confidential nature of Jain and Pillai's work, they both signed, among other things, Proprietary Information and Inventions Agreements and Non-Disclosure of Trade Secrets Agreements, which, in part, confirms Palantir's ownership of these trade secrets.

6.     Unfortunately, Palantir's trust was misplaced. Defendants Pillai and Jain took Palantir's work and applied to a startup incubator to commercialize these projects for their own financial gain — and did so while still employed and working on these projects at Palantir. They applied to **found a company to "automate denials management with AI," so that providers could "reduce write-offs and eliminate hundreds of hours of administrative work."** The startup incubator accepted the application. Pillai and Jain learned that they had secured $500,000 for the new startup and stayed at Palantir until just a few short days before boarding a flight to San Francisco and incorporating their startup.

7.     There is no mistaking Defendants' work for anything but a rip-off of Palantir. Only weeks after their resignation, Pillai and Jain were boasting that they had already deployed "Guardian AI's" solution and saved customers more than $150,000. They did not conceal the connection between their old work and new business. To the contrary, they used it as a selling point: "After helping hospitals implement AI workflows at Palantir," they wrote, "our team has built a product to help healthcare providers automate how they manage insurance claim denials."

3

8.     Despite the unabashed nature of Defendants' conduct, Palantir attempted to resolve this matter without the assistance of the Court (beginning in August 2024, shortly after Defendants' efforts to publicize Guardian AI). Those attempts failed, necessitating this lawsuit.

## PARTIES

9.     Palantir Technologies Inc. is a Delaware corporation with its principal offices in Denver, Colorado.

10.     Pranav Pillai is an individual who, upon information and belief, resides in this district.

11.     Mayank Jain is an individual who, upon information and belief, resides in New York, New York.

12.     Guardian AI, Inc. is a Delaware corporation with its principal place of business in this district.

13.     Defendants DOES 1 through 10, inclusive, are unknown to Palantir, who, therefore sues said DOE Defendants by their fictitious names. Palantir is informed and believes, and on that basis alleges, each of the fictitiously named Defendants is responsible in some manner for the acts and occurrences alleged herein and the damages caused hereby. When ascertained, their true names and capacities shall be reflected in an amended complaint.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Defend Trade Secrets Act, Pub. L. No. 114-153 (2016), codified at 18 U.S.C. § 1831 *et seq.* ("DTSA"). This Court has supplemental jurisdiction over Palantir's remaining claims pursuant to 28 U.S.C. § 1367 because those claims are so related to the DTSA claim that they form part of the same case or controversy.

15.     This Court has personal jurisdiction over Pillai and Jain because (1) upon information and belief, they are residents of New York, and (2) because Pillai and Jain contractually consented to this Court's exercise of personal jurisdiction over them.

16.     This Court has personal jurisdiction over Guardian AI, Inc. because, upon information and belief, its principal place of business is in New York.

17.     Venue is proper in this Court (1) pursuant to 28 U.S.C. § 1391(b)(1) because Pillai and Guardian AI reside in this judicial district, (2) pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Palantir's claims occurred in this district, and (3) because Pillai and Jain contractually agreed that venue would be proper in this district for this action.

## STATEMENT OF FACTS

**A. Palantir's software seamlessly connects disparate data sources with enterprise-ready AI.**

18.     Palantir builds software that empowers organizations to effectively integrate their data, decisions, and operations at scale. The company started by building software for the U.S. intelligence community to assist in counterterrorism investigations and operations. Palantir later began working with commercial enterprises, which often faced similar challenges when working with data. Today, Palantir has a market capitalization of approximately $193 billion. It devotes hundreds of millions of dollars to funding research and development each year.

19.     Palantir has built four principal software platforms, Palantir Gotham ("Gotham"), Palantir Foundry ("Foundry"), Palantir Artificial Intelligence Platform ("AIP"), and Palantir Apollo ("Apollo").

20.     The software platforms underlying the healthcare projects described in this action are Foundry and AIP. Foundry, which Palantir has developed over the course of more than a decade, enables institutions to transform massive amounts of information into an integrated data

asset that reflects their operations. AIP leverages machine learning and large language models ("LLMs") directly within Foundry to help connect AI to enterprise data.

21.    In 2021, Palantir announced the launch of Foundry for Builders, an initiative dedicated to supporting early-stage companies by providing them with the Palantir Foundry platform. In March 2024, Palantir introduced AIP Now, a service that permits developers and third parties to integrate Palantir's market-leading AI tooling and Foundry into their operations.

**B.  As a result of its research and development, Palantir successfully deployed its solutions in the healthcare industry — including by developing a system to automate how providers appeal insurance company denials.**

22.    Palantir recognized that its market-leading AI and data analytics software held tremendous promise for healthcare companies and dedicated substantial efforts and investment to expanding in the field.

23.    Palantir succeeded. Palantir developed a variety of solutions for providers that are now offered under the label "Palantir for Hospitals." This initiative equips providers with state-of-the-art software configured for various clinical settings. It powers critical workflows for over 15% of U.S. hospitals, including for nurse scheduling, nurse staffing, transfer center optimization, and discharge management.

24.    Palantir's healthcare business grew 267% between 2020 and the first half of 2022. In 2023, Palantir announced a multiyear partnership with a world-famous healthcare organization to deliver an operations virtual command center to help the hospital with data-driven decision-making and resource allocation. The same year, NHS England contracted Palantir for a seven-year project to overhaul its current technology system. Palantir's rapid expansion in healthcare has

drawn substantial press attention.[1] Its growth is such that in August 2024, Palantir's Chief
Technology Officer noted in an X post that "Palantir's software manages 21% of hospital beds in
the US. It is one of our fastest growing areas."[2]

25.    Palantir's Healthcare division achieved this success, in part, by using its insight into
the industry to discern how customers can benefit most from Palantir's industry-leading data
analytics and AI capabilities. Palantir devises a solution, builds it, and works with customers to
deploy those solutions in their organizations. Palantir maintains valuable trade secrets arising from
its insights into and development of offerings for healthcare clients, including, but not limited to,
the Trade Secrets defined in paragraphs 75-78 of the Complaint.

26.    As relevant here, Palantir knew, from its experience in healthcare, that healthcare
providers face substantial issues with *Revenue Cycle Management*. "Revenue Cycle Management"
refers to the provider's financial operations for collecting revenue. Some sources describe Revenue
Cycle Management as "all administrative and clinical functions that contribute to the capture,
management, and collection of patient service revenue."[3]

27.    Revenue Cycle Management can be an unwelcome distraction from providers' core
mission of providing healthcare to patients. Providers must grapple with late payments, denied
payer claims, and operational costs from generating and pressing appeals. Providers must dedicate

---

[1]    *See, e.g.,* Sai Balasubramanian, *Palantir Is Rapidly Expanding Its Presence in
Healthcare*, Forbes, (June 23, 2023), https://www.forbes.com/sites/saibala/2023/06/23/palantir-
is-rapidly-expanding-its-presence-in-healthcare/; Analisa Romano, *Palantir's healthcare
business takes off with new AI tool*, Denver Business Journal (Oct. 19, 2023),
https://www.bizjournals.com/denver/news/2023/10/19/palantir-health-care-hospitals-ai.html.

[2]    Shyam Sankar (@ssankar), X, (Aug. 14, 2024, 8:27 P.M.),
https://x.com/ssankar/status/1823879184730743242.

[3]    *See e.g., Cardiovascular Care Reemergence Playbook: Finances/Revenue Cycle*,
MedAxiom, https://www.medaxiom.com/playbook/cv-care-re-emergence-playbook/finances-
revenue-cycle/ (last visited Feb. 6, 2025).

substantial personnel, time, and effort to tasks such as (i) discerning payer guidelines for the provision of healthcare, (ii) researching patient data and provider notes, (iii) complying with payer procedures, (iv) communicating with payers, and (v) processing and drafting appeals for denied claims for payment. Due to time limits on filings, some providers cannot timely appeal at all, and simply write off the cost of the healthcare services.

28.    Palantir was uniquely well-suited to tackling these challenges. Palantir's platforms specialize in integrating data from a wide range of sources and seamlessly connecting that data with its enterprise-ready artificial-intelligence solutions. Palantir's Healthcare division developed a number of software tools to help providers improve their Revenue Cycle Management.

29.    Palantir combined its insights into provider needs with its expertise in improving operational efficiency using automation, such as AI-powered workflows, to develop a new system to automate the heavy lifting of drafting appeals of claim denials. ███████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███ utilize an AI agent to ████████████████████████ generate a first draft of a letter appealing the denial.

30.    Palantir developed this system ██████████████████████████████

████████████████

a. AI-assisted appeals generation. ██████████████████

██████████████████████████████████████████ and

automatically draft appeals letters;

b. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████

c. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

31.    ████████████████████████████████████████

████████████████████████████████████████

32.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████

33.    A representative from one of Palantir's customers delivered a presentation at a

public industry event hosted by Palantir called AIPCon (Artificial Intelligence Platform

Convention) in September 2024. She showed that Palantir's work for the customer led to a 100%

increase in the efficiency of appeals-letter writing, a more-than-$10 million annualized value from

an increase in accounts receivable, and more than $1 million in projected savings from employee re-allocation. Palantir's solution helped the provider focus its efforts on patients, not paperwork.

**C. Pillai and Jain gained access to Palantir's trade secrets and confidential information while working on Palantir's healthcare Revenue Cycle Management solutions.**

34.     Pillai and Jain joined Palantir and began working in its Healthcare division during remarkable growth. Palantir provided Defendants Pillai and Jain with the opportunity to work on many aspects of Palantir's development, proposals, and deployment of provider Revenue Cycle Management solutions, including the above-noted proposals.

35.     Upon information and belief, Pillai and Jain had no experience designing revenue cycle management solutions prior to joining Palantir.

36.     Jain began working for Palantir as a full-time employee on February 21, 2022. Pillai followed suit on August 22, 2022. As more fully alleged below (§ H, ¶¶ 64-69), before Pillai and Jain commenced their employment with Palantir, each voluntarily executed employment agreements and agreed (i) to use Palantir's confidential information only in the course of their employment with Palantir, (ii) that Palantir would own any designs, know-how, ideas and information made or conceived or reduced to practice by them during their employment, (iii) not to compete with Palantir for a year after the termination of their employment, (iv) that New York law would govern their Employment Agreements, and (v) that the state and federal courts of New York would be the exclusive jurisdiction and venue for any lawsuits filed in court against them by Palantir.

37.     Pillai and Jain primarily worked within Palantir's Healthcare division. In their roles as "Forward Deployed Engineers," they received Palantir's confidential and trade secret information related to Palantir's business, its software, the business needs and preferences of its customers, and the methods and processes by which Palantir deployed its solutions at its

customers, and more. Their access to Palantir's trade secrets included the Trade Secrets defined in paragraphs 75-78 of the Complaint.

38.    Palantir tasked Pillai and Jain with working on Revenue Cycle Management, AI-assisted appeals generation, and related projects for healthcare customers. Pillai and Jain worked on and prepared proposals for AI-assisted appeals generation, ████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████ They had access to Palantir's confidential and trade secret information from the inception of the relevant projects to the metrics that demonstrated success.

## D. While still employed at Palantir, Pillai and Jain applied to a startup incubator to replicate Palantir's work for their own company.

39.    Pillai and Jain knew firsthand the value of the Revenue Cycle Management solutions that Palantir had invented, designed, developed, and successfully deployed for its customers. They discussed forming a startup company together. They did so while employed at Palantir, and even used Palantir's resources to do so.

40.    Pillai and Jain identified Y Combinator, a startup incubator, as a potential source of funds. Y Combinator invests $500,000 in startups and hosts a program to help them "really take off."[4]

41.    Pillai and Jain applied to Y Combinator's so-called "Summer 2024" batch with a proposal to assist healthcare systems with revenue cycle management, including, most

---

[4]    *What Happens at YC*, Internet Archive Wayback Machine, https://web.archive.org/web/20240304124024/https://www.ycombinator.com/about (captured Mar. 4, 2024).

prominently, using AI to appeal insurance claim denials. According to Y Combinator's website, the regular deadline to apply for that Y Combinator batch was April 22, 2024.[5] Y Combinator accepted last-minute applications for its S24 batch as late as June 13, 2024, and notified participants of acceptance decisions no later than June 20.[6] Thus, upon information and belief, Pillai and Jain conceived of Guardian AI and the associated technology proposal, applied to Y Combinator, and learned that their application was accepted, while they were employed at Palantir.

42.     Pillai and Jain knew their employment agreements with Palantir prohibited them from applying for Y Combinator with Palantir's idea, much less proceeding with this proposed business.

43.     In the course of filling out the Y Combinator application, Pillai and Jain saw a question to the effect of, "Are any of the founders covered by non-competes or intellectual property agreements that overlap with your project? If so, explain."

44.     Pillai and Jain's startup proposal, named Guardian AI, was ultimately accepted into the "Summer 2024" batch of Y Combinator.[7] Y Combinator's award of $500,000 to the startup underscores the value of the Palantir intellectual property that Pillai and Jain incorporated into their application.

---

[5]     *See Apply to Y Combinator*, Internet Archive Wayback Machine, https://web.archive.org/web/20240306035331/https://www.ycombinator.com/apply/ (captured Mar. 6, 2024).

[6]     *Last chance to apply for YC's S24 batch*, Y Combinator (June 5, 2024), https://www.ycombinator.com/blog/apply-ycs24.

[7]     *See, e.g.,* Y Combinator (@ycombinator), X (Aug. 23, 2024, 3:00 P.M.), https://x.com/ycombinator/status/1827058226141032579?mx=2.

45.     The acceleration/incubation portion of Y Combinator's Summer 2024 batch ran from July to September 2024 in San Francisco, California. It began no later than July 9, 2024.[8]

**E. Pillai and Jain recreated Palantir's work using Palantir's trade secrets and Palantir's technology tools.**

46.     Pillai's last day at Palantir, June 18, 2024, was just a few weeks before the Y Combinator start date. Pillai's last day was July 3, 2024, less than a week before the start date.

47.     In the months preceding his departure and up to his last day at Palantir, ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

48.     Pillai and Jain obtained the domain name www.withguardian.ai no later than July 4, 2024. They caused Guardian AI, Inc. a Delaware corporation, to be incorporated on July 8, 2024, and launched a website no later than July 16.

49.     Underscoring that their business was a mere rip-off of Palantir's work, Pillai and Jain even built "Guardian AI's" system using aspects of the same Palantir technology stack they had been using at Palantir. Specifically, within 24 hours of his last day, Jain contacted Palantir with an urgent request to sign up for AIP and Foundry as a third-party developer. Palantir allows such developers to use these tools to deploy Palantir's AI solutions for their own apps and deployments.

**F. Pillai and Jain publicized the success of "Guardian AI" in August 2024, shortly after leaving Palantir.**

50.     Armed with Palantir's confidential information, trade secrets, and technology tools, Pillai and Jain were, apparently, able to quickly recreate and deploy their own AI-enabled Revenue

---

[8]     Y Combinator (@ycombinator), Instagram (July 9, 2024), https://www.instagram.com/ycombinator/p/C9ONq0uv5f0/?img_index=8

Cycle Management solution. In or around August 2024, Y Combinator, Pillai, and Jain began publicizing the nature of Guardian AI's business. By way of example, an August 23, 2024, tweet/X post by Y Combinator congratulated Pillai and Jain on the launch of Guardian, noting that "Guardian (YC S24) uses AI to help healthcare providers fight insurance denials." A Y Combinator business profile page from around the same time boasted that "within a month of launching, Guardian has helped recoup >$150,000 in claim value for providers." Guardian AI's ability to build and deploy a solution on that timeframe was enabled in substantial part by Pillai and Jain's misappropriation of trade secrets.

51.    When word reached Palantir of the nature of Guardian's business, Palantir took steps to learn more about Guardian AI. Palantir found concerning the following description that, upon information and belief, Guardian AI wrote and caused to be posted on Y Combinator's website:

**TL; DR**

After helping hospitals implement AI workflows at Palantir, our team has built a product to help healthcare providers automate how they manage insurance claim denials. . . . Within a month of launching, Guardian has helped recoup >$150,000 in claim value for providers.

. . .

The last two years at Palantir, Mayank and Pranav have been working with some of the biggest health systems in the country who, despite their size, had hundreds of millions in unpaid claims and were shutting down hospitals.

Denial management is a manual and painstaking process. Healthcare providers have a long string of tasks to complete — (1) call payers, (2) write appeal letters, (3) scrape patient charts for missing diagnoses and authorizations, (4) check for clerical errors, (5) check clearinghouses for patient eligibility and provider enrollment — the list goes on. There are so many tasks and systems required to work a denial that most healthcare providers end up writing off 5-20% of their accounts receivable.

Our platform serves as a one-stop shop for denials management, where AI agents manage claims from end-to-end.

. . .

Mayank and Pranav were two of the first members of Palantir's Commercial Healthcare Team. They've worked together to improve hospital operations at some of the largest health systems in the country.

After implementing AI programs at health systems the last several years, they look forward to democratizing AI across US healthcare and avoiding heartbreaking hospital and clinical practice closures.

🐻 ~~Our ask:~~ 💰 **Our Offer:**

We do risk-free, rapid denials + AR age assessments for hospitals and medical practices. Give us your unpaid claims and we'll run them through our software to find slam-dunk cases which payers have mis-processed - we've consistently found over $100K in low-hanging fruit when we've done this.

*Guardian AI: Helping healthcare providers fight insurance claim denials*, Y Combinator,

https://www.ycombinator.com/launches/LfK-guardian-ai-helping-healthcare-providers-fight-

insurance-claim-denials (last visited Feb. 6, 2025).

52.    A visit to Guardian AI's website confirmed the nature of the business:



Wayback Machine Archive of www.withguardian.ai,

https://web.archive.org/web/20240723062932/https://withguardian.ai/, captured July 23, 2024.

53.    In sum, it appeared that Pillai and Jain had simply repackaged Palantir's work for their own startup. They "created" an AI workflow to help healthcare providers automate appeals for insurance claim denials. The entire description, from the identification of the problem (the

manual, painstaking nature of drafting claim denial appeals, the disparate data sources, the write-offs, etc.) to the description of the solution, echoed the same proposals that Palantir, including Pillai and Jain, had presented to its own customers just months before.

54.     Pillai and Jain's own marketing appeared to acknowledge as much. The Y Combinator page quoted above heavily trades on the founders' "last two years at Palantir" in which they "work[ed] with some of the biggest health systems" and helped "implement AI workflows." Separately, in a now-scrubbed post, they wrote that "we know this [about providers' problems] because we sat next to the team helping them do this in our previous roles."

**G. In September 2024, Palantir contacted Pillai and Jain to obtain further information, remind them of their employment obligations, and amicably resolve their dispute.**

55.     Palantir decided to learn more about Guardian AI's business. Its efforts included contacting Pillai and Jain to inquire about their work and ensure that Pillai and Jain were aware of their post-employment obligations.

56.     Palantir reminded Pillai and Jain of their employment obligations on multiple occasions: at first informally (in September 2024), and then in letters sent by counsel in October and November 2024.

57.     Pillai and Jain were defiant and deceptive. By way of example, in an October 29, 2024 response to Palantir, Pillai and Jain wrote that "we have barely built anything . . . so this seems like a forward-looking conversation." That representation is belied by Guardian AI's prior public statements in which it asserts that it "has built a product," that they have "consistently found over $100k in low-hanging fruit," and that "within a month of launching, Guardian has helped recoup >$150,000 in claim value for providers."

58.     Despite months of good-faith effort and correspondence (from September 2024 through January 2025) in which Palantir (i) urged Pillai and Jain to abide by their voluntary

commitments to Palantir, and (ii) gathered further information concerning Defendants' misappropriation and breach of Pillai and Jain's employment agreements, Guardian AI, Pillai and Jain refuse to cooperate. Indeed, they have since updated their website to effectively admit they are trading off of Palantir's work with "top health systems in the country":

# Fight Denials with AI

Automate denials management like the top health systems in the country

Guardian AI, Inc., *www.withguardian.ai* (last visited Feb. 10, 2025).

59.     Palantir's research into Guardian AI's business has confirmed that Pillai and Jain have violated their employment agreements with Palantir and flatly refuse to abide by the employment agreements they signed before they began their work at Palantir. They recreated Palantir's offerings using Palantir's trade secrets and confidential information. Palantir thus seeks the Court's aid in enforcing the terms of their employment agreements and remedying trade secret theft.

**H. Pillai and Jain violated their promises to protect Palantir's confidential information and not to compete with Palantir for a year after termination.**

60.     Pillai and Jain each executed certain employment-related agreements in connection with their employment at Palantir (the "Employment Agreements"), including the following:

| Agreement Title | Pillai Execution Date | Jain Execution Date |
|---|---|---|
| Offer Letter | August 12, 2022 | December 21, 2020[9] |

---

[9]     Jain executed the employment agreements in advance of an internship, which accounts for the year gap between execution and his commencement of full-time employment in February 2022.

| Proprietary Information and Inventions Agreement | August 12, 2022 | December 21, 2020 |
|---|---|---|
| Arbitration Agreement | August 12, 2022 | December 21, 2020 |
| Non-Disclosure of Trade Secrets Agreement | August 13, 2022 | February 22, 2022 |

61.     In the Employment Agreements, Pillai and Jain agreed to (i) assign their inventions to Palantir and (ii) to maintain Palantir's non-public business, technical, and financial information as confidential by using it only in the course of their employment with Palantir.

62.     By way of example, Pillai and Jain agreed to the following provisions in the Proprietary Information and Inventions Agreement:

> 2. Ownership. [Palantir] shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, sui generis database rights and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by me during the term of my employment with Company (collectively "Inventions")
>
> . . .
>
> 4. Proprietary Information. I agree that all Inventions and all other business, technical and financial information (including, without limitation, the identity of and information relating to customers or employees, price lists, pricing structures, marketing and sales information, business plans or dealings, designs, formulae or research activities) I develop, learn or obtain during my employment that relate to [Palantir and any of its subsidiaries], or the business or demonstrably anticipated business of the [Palantir and any of its subsidiaries] or that are received by or for the [Palantir and any of its subsidiaries] in confidence, constitute "Proprietary Information." I will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information.
>
> . . .
>
> 8. Continuing Obligations. I agree that my obligations under paragraphs 2, 3, 4, and 6 of this Agreement shall continue in effect after termination of my employment, regardless of the reason or reasons for termination, and whether such termination is voluntary or involuntary on my part . . . .
>
> . . .

> [I]f my Home State is New York or New Jersey, I shall indemnify [Palantir] from any and all costs, fees, or expenses incurred by [Palantir] (including, but not limited to, attorneys' fees) in successfully enforcing the terms of this Agreement against me ... as a result of my breach or threatened breach of any provision contained herein.

63.     Pillai and Jain also agreed to the following provisions in the Non-Disclosure of

Trade Secrets Agreement:

> In consideration of my potential or actual employment by Palantir . . . I the undersigned hereby agree . . .
>
> 1. That during or in connection with my employment with Palantir there may be disclosed to me certain trade secrets or proprietary or confidential information consisting of or relating to the following, collectively referred to in this agreement as Confidential Information:
>
> a) Technical information such as methods, algorithms, designs, processes, formulae, compositions, systems, techniques, inventions, machines, computer systems and programs, technology architecture, and research projects;
>
> b) Business or operational information such as customer lists, personnel information, information or other data from or relating to customers, customer project information, strategic plans, pricing data, financial or equity information, product information, intellectual property, and marketing, production, or merchandising systems or plans; and
>
> c) All other information that I knew, or reasonably should have known, was proprietary or confidential information of Palantir or its customers, affiliates or other parties associated with Palantir.

64.     In the Employment Agreements, Pillai and Jain also agreed to refrain from

competing with Palantir after termination of their employment.

65.     Specifically, Pillai and Jain agreed to the following provisions in the Proprietary

Information and Inventions Agreement (paragraph breaks added):

> *6.3 Non-Competition.* I agree that until twelve (12) months immediately following the termination of my employment with the Company, whether I resign voluntarily or am terminated by the Company involuntarily, I will not engage in any Prohibited Activity.
>
> For purposes of this Section 6.3, "Prohibited Activity" is an activity in which I perform the job functions that I performed during my employment with Company,

directly or indirectly, in whole or part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, partner, director, stockholder, officer, intern or any other similar capacity for an entity engaged in the same or similar business as the Company and/or the Group, including those engaged in the business of developing and selling analytical software, whether existing or planned.

I understand and agree that the restraint imposed under this Section 6.3 is necessary and reasonable to protect the Company's legitimate business interests and not unduly harsh or oppressive.

Nothing herein shall prevent me from taking employment with an analytical software company where I am not performing the same functions, directly or indirectly, as set forth in this Section 6.3. I understand that nothing contained in this Section 6.3 shall apply to me if my Home State (as defined below) is California.

. . .

6.4 Acknowledgments and Representations. I acknowledge that the Company sells and provides its products and services worldwide and agree that the time periods, geographic regions and scope limitations referred to in Sections 6.1-6.3 above are reasonable and valid in light of the nature and extent of the business conducted by the Company, especially in light of the Company's need to protect its Proprietary Information and the international scope and nature of the Company's business.

I also represent that my experience and capabilities are such that the enforcement of the foregoing covenants will not prevent me from working in my occupation, from earning a livelihood, and acknowledge that it would cause the Company serious and irreparable injury and cost if I were to use my knowledge in competition with the Company or otherwise breach the obligations contained in this Agreement.

If the scope of any of the restrictions set forth above are deemed by any court or tribunal to be too broad to permit enforcement of such restriction to its full extent, then such restriction shall be enforced to the maximum extent permitted by law, and the Company and I hereby consent and agree that such scope may be judicially modified accordingly in any proceeding brought to enforce such restriction.

In the event of my breach or violation of Sections 6.1 – 6.3, or good faith allegation by the Company of my breach or violation of this Sections 6.1 – 6.3, the relevant restricted period(s) set forth in Sections 6.1 – 6.3 shall be tolled until such breach or violation, or dispute related to an allegation by the Company that I have breached or violated Sections 6.1 – 6.3, as applicable, has been duly cured or resolved, as applicable.

66.     Pillai and Jain also agreed that New York law, without regard to New York's conflicts of law rules, would govern their Employment Agreements. Palantir's Offer Letter and Arbitration Agreement expressly call for the application of New York law. Palantir's Proprietary

Information and Inventions Agreement call for the application of the laws of Pillai and Jain's "Home State," which was defined as "the state in which I am primarily, physically located for work for [Palantir]." For both Pillai and Jain, the Home State was New York state.

67.    Pillai and Jain also agreed that to the extent that any lawsuit is permitted under their Arbitration Agreement with Palantir, they "expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in New York for any lawsuit filed against me by the Company." Arbitration Agreement § 2.

68.    Notably, Pillai and Jain refused to sign their separation agreements, which would have, among other things, required them to reaffirm their existing obligations of non-competition and confidentiality and to warrant that they were in breach of their contractual obligations to Palantir.

**I.  Defendants intentionally misappropriated Palantir's important trade secrets, causing harm to Palantir's reputation and competitive advantage, and delaying Palantir's market expansion.**

69.    Palantir invests hundreds of millions of dollars in research and development each year, resulting in innovative software and proprietary implementation strategies that deliver immense value to healthcare systems worldwide. Palantir's approach to deploying AI automation significantly reduces implementation timelines, enabling healthcare systems to adopt AI-driven solutions rapidly. This leads to tangible benefits in patient care and operational efficiency, helping Palantir maintain its competitive market advantage.

70.    Palantir is highly protective of its trade secrets and goes to great lengths to protect them from unauthorized use or disclosure. Palantir maintained internal policies and procedures that instructed employees on appropriately using and safeguarding Palantir's trade secrets. Palantir

also required its employees to sign confidentiality agreements and agree to non-compete provisions to prevent the misuse or unauthorized disclosure of Palantir's trade secrets.

71.    To the extent any third parties required access to Palantir's trade secrets, Palantir required those third parties to sign confidentiality agreements to prevent misuse or unauthorized disclosure.

72.    Palantir imposes physical safeguards to protect and limit access to its trade secrets, including using secure and locked spaces that prevent unauthorized individuals from accessing the trade secrets. Palantir also imposes electronic safeguards to protect and limit access to its trade secrets, including network passwords, network monitoring, encryption, access control, and file control software. For example, Palantir's repository of high-value demos for AI-driven healthcare solutions is gated by strict access controls, and only a limited number of Palantir employees can access this repository.

73.    Palantir's trade secrets derive significant value from not being generally known or readily ascertainable. That value has been diminished by Defendants' theft and continued use of those trade secrets.

74.    Palantir's trade secrets, which were misappropriated by Pillai and Jain and used for their work at Guardian AI, Inc., include at least the following:

75.    



c. ███████████ ████████ ███ ████████ ██ ████ ████ ████ ████ ████
███ ██ ███ ████ ████ ██ ████ ████ ███ ████

████████████████████████████████████

████████

d. █████████████████████████████████████

█████████████████████████████████████

████████████████████

e. Proprietary techniques for designing user interfaces optimized for intuitive interaction with frontline healthcare workers and IT departments ("Appeal Letter Frontend Design");

f. █████████████████████████████████████

█████████████████████████████████████

████████████████

g. █████████████████████████████████████

███████████████████████

76. ███████████████████████

a. █████████████████████████████████████

███████████████████████████

████████████

b. █████████████████████████████████████

███████████████████



77.    Trade secrets relating to Palantir's go-to-market strategies for AI-driven solutions for healthcare providers:

   a.  Proprietary strategies for engaging with healthcare systems;

   b.  ████████████████████████████████████████████

   c.  Proprietary strategies for interfacing with healthcare providers to deploy AI-driven solutions ████████████████████████████████

   d.  ████████████████████████████████████████████

   ████████████████████████████████████████████

   ██████████████

   e.  ████████████████████████████████████████████

   ████████████████████████████████████

   ████████████

78.    Further, Palantir alleges, under Rule 11(b)(3) of the Federal Rules of Civil Procedure, that after a reasonable opportunity for further investigation, party discovery, or third-party discovery, Palantir will likely have evidentiary support that Pillai and Jain also misappropriated the following trade secrets by, *inter alia*, revealing them to potential customers, investors, employees, or agents:

   a.  ████████████████████████████████████████████

   b.  ████████████████████████████████████████████

   ██████████████████████████████████████

   c.  ██ ████ ███ ███ ████ ███ ████ ██ ████ ████

   ████████████████████████████████████████████

   ███ ████ ███ █ ████ █ █ ██ ████ ██



d.

e.

f.

g.

h.

79.    Defendants' misappropriation and use of the trade secrets identified above (the "Trade Secrets") has harmed, and continues to harm, Palantir.

80.    Pillai's and Jain's breaches, and their and Guardian AI's misappropriation and unfair competition, have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, damaging Palantir's reputation and industry standing, and delaying Palantir's market expansion.

81.     Moreover, Palantir has been irreparably harmed because Pillai and Jain, through their ownership, operation, and promotion of Guardian AI, Inc., are likely to disseminate Palantir's Trade Secrets to additional third parties (such as potential investors, investors, customers, and potential customers), including those that have no privity of contract with Palantir.

## FIRST CAUSE OF ACTION
### (Breach of Contract, Covenant Not to Compete)
### Against Pillai and Jain

82.     Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 81 of the Complaint as if fully set forth herein.

83.     Palantir is party to legally binding contracts with each of Pillai and Jain, and Palantir has performed in accordance with the contracts.

84.     Pillai and Jain breached the express terms of their agreements with Palantir, including, specifically, Sections 6.3 and 6.4 of the Proprietary Inventions and Assignments Agreement, quoted *supra* at paragraph 65 of the Complaint.

85.     Pillai and Jain breached those terms of their agreements with Palantir by performing the job functions that they performed during their employment with Palantir, directly and indirectly, as an employee, employer, owner, and operator for Guardian AI, Inc., an entity engaged in the same or similar business as Palantir.

86.     Pillai's and Jain's breaches have harmed Palantir.

## SECOND CAUSE OF ACTION
### (Breach of Contract, Confidentiality, Assignment, and Related Obligations)
### Against Pillai and Jain

87.     Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 81 of the Complaint as if fully set forth herein.

88.     Palantir is party to legally binding contracts with each of Pillai and Jain, and Palantir has performed in accordance with the contracts.

89.     By using Palantir's Tade Secrets and Proprietary Information to apply for a startup incubator, then to found and operate Guardian AI, Inc., Pillai and Jain breached the express terms of their agreements with Palantir, including, specifically, the Trade Secrets Agreement and Sections 2, 4, and 8 of the Proprietary Inventions and Assignments Agreement, as quoted above in paragraph 62-63 of the Complaint.

90.     Pillai and Jain have breached these terms of their Employment Agreements by creating and seeking to commercialize a product using Palantir's Trade Secrets, including by founding, operating, owning, and promoting Guardian AI, Inc.

91.     Pillai's and Jain's breaches have harmed Palantir.

92.     Pillai's and Jain's breaches have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, damaging Palantir's reputation and industry standing, and delaying Palantir's market expansion.

93.     Moreover, Palantir has been irreparably harmed because Pillai and Jain, through their ownership, operation, and promotion of Guardian AI, Inc., are likely to disseminate Palantir's Trade Secrets to additional third parties (such as potential investors, investors, customers, and potential customers) (such as potential investors, investors, customers, and potential customers), including those that have no privity of contract with Palantir.

## THIRD CAUSE OF ACTION
### (Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1832)
#### Against All Defendants

94.     Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 81 of the Complaint as if fully set forth herein.

95.    Palantir owns the Trade Secrets as described above.

96.    Palantir's Trade Secrets are closely guarded and derive both actual and potential economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. They qualify as trade secrets within the meaning of 18 U.S.C. § 1832.

97.    At all relevant times, Palantir has taken reasonable measures to protect the confidentiality of its Trade Secrets described above.

98.    Pillai and Jain knew that they had legal duties and obligations prohibiting them from disclosing or using Palantir's Trade Secrets for any purpose other than their employment at Palantir.

99.    Pillai and Jain received these Trade Secrets from Palantir and used them without permission to develop and operate Guardian AI, Inc. for their own economic benefit. They knew that the Trade Secrets were acquired by improper means, namely, in breach of their Employment Agreements with Palantir. Their misappropriation of the Trade Secrets was done knowingly and without Palantir's express or implied consent, and they were used in or intended for use in interstate commerce.

100.    Guardian AI, Pillai, and Jain's misappropriation of Palantir's trade secrets has proximately caused damages to Palantir, including, but not limited to, lost profits, goodwill, competitive advantage, and business opportunities.

101.    Guardian AI, Pillai, and Jain have also been unjustly enriched by their misappropriation of Palantir's trade secrets.

102. Defendants' misappropriation of Palantir's trade secrets was intentional, willful, wanton, reckless, and malicious, and warrants injunctive relief against all Defendants and exemplary damages against Guardian AI, Inc..

103. Defendants' breaches have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, damaging Palantir's reputation and industry standing, and delaying Palantir's market expansion.

104. Moreover, Palantir has been irreparably harmed because Guardian AI, Pillai, and Jain, have already and are likely in the future to disseminate Palantir's Trade Secrets to additional third parties (such as potential investors, investors, customers, and potential customers), including those that have no privity of contract with Palantir.

105. Defendants' breaches have irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, damaging Palantir's reputation and industry standing, and delaying Palantir's market expansion.

## FOURTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets, New York Common Law)
#### Against All Defendants

106. Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 81 of the Complaint as if fully set forth herein.

107. Palantir owns the Trade Secrets as described above.

108. Palantir's Trade Secrets are closely guarded and derive both actual and potential economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. They qualify as trade secrets within the meaning of New York common law.

109.    At all relevant times, Palantir has taken reasonable measures to protect the confidentiality of its Trade Secrets described above.

110.    Pillai and Jain knew that they had legal duties and obligations prohibiting them from disclosing or using Palantir's Trade Secrets for any purpose other than their employment at Palantir.

111.    Pillai and Jain received these Trade Secrets from Palantir and used them without permission to develop and operate Guardian AI, Inc. for their own economic benefit. They knew that the Trade Secrets were acquired by improper means, namely, in breach of their Employment Agreements with Palantir. Their misappropriation of the Trade Secrets was done knowingly and without Palantir's express or implied consent.

112.    Pillai and Jain's receipt of Palantir's Trade Secrets from Palantir and reliance on the Palantir Trade Secrets for its development and operating of Guardian AI, Inc. constitutes misappropriation under New York common law.

113.    Defendants' misappropriation of Palantir's Trade Secrets was committed with the intention of and had the effect of causing Palantir injury.

114.    Defendants' breaches have damaged and irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, damaging Palantir's reputation and industry standing, and delaying Palantir's market expansion.

115.    Moreover, Palantir has been damaged and irreparably harmed because Defendants are likely to disseminate Palantir's trade secrets to additional third parties (such as potential investors, investors, customers, and potential customers), including those that have no privity of contract with Palantir.

## FIFTH CAUSE OF ACTION
### (Unfair Competition, New York Common Law)
### Against All Defendants

116.    Palantir repeats and re-alleges each and every allegation contained in paragraphs 1 through 81 of the Complaint as if fully set forth herein.

117.    In engaging in the conduct described above, including the misappropriation of Palantir's Trade Secrets and breach of Pillai and Jain's agreements with Palantir, Guardian AI, Pillai, and Jain have misappropriated the results of the labor, skill, and expenditure of Palantir and thereby engaged in unfair competition.

118.    This misappropriation was done in bad faith and represents Guardian AI, Pillai, and Jain's exploitation of commercial advantage that had belonged exclusively to Palantir and thus constitutes unfair competition.

119.    Defendants committed their actions knowingly, deliberately, and willfully in disregard of Palantir's rights.

120.    Defendants' conduct has irreparably harmed Palantir by causing harm to its competitive advantage, causing loss of opportunity to Palantir, damaging Palantir's reputation and industry standing, and delaying Palantir's market expansion.

121.    Moreover, Palantir has been irreparably harmed because Pillai and Jain, through their ownership, operation, and promotion of Guardian AI, Inc., are likely to disseminate Palantir's trade secrets to additional third parties (such as potential investors, investors, customers, and potential customers), including those that have no privity of contract with Palantir.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Palantir Technologies Inc. respectfully requests that this Court:

    A.    Enter an order preliminarily and permanently enjoining Guardian AI, Inc., Mayank Jain, and Pranav Pillai, and all persons and/or entities acting on their behalf, for

their benefit, or in active concert or participation with them, from disclosing or using any of Palantir's trade secrets or other confidential or proprietary information;

B.   Enter an order preliminarily and permanently enjoining Mayank Jain and Pranav Pillai from continued competition from Palantir Technologies Inc. for one year from the earlier of (i) the effective date of the order, or (ii) Pillai and Jain's discontinuation of their work with Guardian AI, Inc. and/or other competitor;

C.   Enter an order for a preliminary and permanent injunction to cause Mayank Jain, Pranav Pillai, and Guardian AI, Inc. to take all necessary and appropriate steps to correct the public record with respect to ownership of Palantir's intellectual property, including (i) all intellectual property developed by Mayank Jain and Pranav Pillai during their employment with Palantir; (ii) all Palantir intellectual property misappropriated by Mayank Jain and Pranav Pillai for their work at Guardian AI, Inc.; and (iii) all intellectual property improperly derived from the foregoing;

D.   Enter an order preliminarily and permanently requiring Guardian AI. Inc., Mayank Jain, and Pranav Pillai, to account for any and all uses of Palantir's trade secrets and confidential information, including all use and disclosure thereof, including the entities and individuals to which any disclosures were made;

E.   Enter an order preliminarily and permanently enjoining Guardian AI, Inc., Mayank Jain, and Pranav Pillai from making any material misrepresentations regarding their ownership of Palantir's trade secrets and intellectual property in any securities transactions or investor agreements;

F.      Enter an order preliminarily and permanently enjoining Guardian AI, Inc., Mayank Jain, and Pranav Pillai from issuing or granting any new equity of Guardian AI;

G.      Enter an order requiring Guardian AI, Inc. to effectuate transfer of its equity to Palantir;

H.      Enter an order requiring Guardian AI, Inc., Mayank Jain, and Pranav Pillai to cease all operations and fundraising efforts of Guardian AI;

I.      Enter an order requiring Guardian AI, Inc. to disgorge monetary gains from the misuse of Palantir's trade secrets and intellectual property;

J.      Enter an order preliminarily and permanently enjoining Mayank Jain, and Pranav Pillai to abide by their contractual obligation to indemnify Palantir from any and all costs, fees, and expenses incurred by Palantir, including but not limited to, attorneys' fees, in enforcing the terms of their Employment Agreements;

K.      Enter an order preliminarily and permanently enjoining Guardian AI, Inc., Mayank Jain, and Pranav Pillai from issuing or granting any new equity of Guardian AI;

L.      As against Guardian AI, Inc., award Palantir compensatory and punitive (i.e., treble) damages, costs, and the reasonable attorneys' fees incurred by Palantir Technologies Inc.; and

M.      Award such other and further relief as this Court deems just and proper.


## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff demands trial by jury on all issues so triable.

Dated: New York, New York
     March 5, 2025

Respectfully submitted,

Bijal V. Vakil (*pro hac vice forthcoming*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
525 University Ave
Palo Alto, CA 94301
Tel: (650) 470-4500
Fax: (650) 470-4570
bijal.vakil@skadden.com

Leslie A. Demers
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Tel: (212) 735-3000
Fax: (212) 735-2000
leslie.demers@skadden.com

William K. Wray Jr. (*pro hac vice
forthcoming*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
500 Boylston St
Boston, MA 02116
Tel: (617) 573-4800
Fax: (617) 573-4822
william.wray@skadden.com

*Attorneys for Plaintiff
Palantir Technologies Inc.*